## HOUSTON v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4210.

Circuit Court of Appeals, Third Circuit.

March 14, 1930.

352

Wm. Clarke Mason, of Philadelphia, Pa., for petitioner.

Allin H. Pierce, of Washington, D. C., for respondent.

Before WOOLLEY and DAVIS, Circuit Judges, and JOHNSON, District Judge.

WOOLLEY, Circuit Judge.

Samuel F. Houston deducted a loss in his income tax return for 1920 as though sustained in that year. The Commissioner disallowed the deduction on the ground that there was not at any time a deductible loss, or, if such a loss in substance, it was not deductible because not sustained in that year and assessed a corresponding deficiency tax. The United States Board of Tax Appeals approved the action of the Commissioner. Thereupon Samuel F. Houston, by petition, brought the case here for review.

This is the outline of a case, exceptional in law because arising out of unusual circumstances, which, to understand the questions involved, must be stated at length.

The Real Estate Trust Company of Philadelphia closed its doors in the year 1906 because of financial embarrassment arising from misuse of its funds by Frank K. Hipple, its president, in financing projects of Adolph Segal, which consisted mainly in an attempt, through the Pennsylvania Sugar Refining Company, to contest the dominant position of the American Sugar Refining Company in the sugar trade. In this adventure the Trust Company became involved by accepting on its loans to Segal collateral of uncertain value and of a character that did not admit of ready liquidation. The Trust Company's affairs were further complicated by an unlawful withdrawal, with Hipple's permission, of collateral pledged on one of its loans to Segal and repledged by him as collateral for a loan of $1,250,000 made to him by Gustav E. Kissel. Included in this collateral were bonds and shares of the Pennsylvania Sugar Refining Company which had an importance beyond their money value because in connection with the loan there was an agreement between Kissel and Segal that until the loan was repaid, Kissel, or his nominee, should have the right to select four of the seven directors of the Pennsylvania Sugar Refining Company and that its refinery should not be operated.

It soon became apparent that the Trust Company's financial embarrassment amounted to positive insolvency in that its capital and surplus had been swept away together with much of its deposits.

George H. Earle, Jr., was appointed receiver. The situation was desperate. And this was so not only in respect to depositors but to the company itself, which had an extensive trust business, a substantial good will, and a valuable business location. It was plain that, if possible, these should be saved for all concerned. The receiver immediately looked about for ways to reorganize the company, calling upon the eleven directors, who were charged by some with financial responsibility and who themselves felt a moral responsibility in the premises. There also arose a question of double liability upon the common stock. To bridge the situation the directors offered their notes in the sum of $3,000,000 on which to raise money and operate the company until its capital and surplus should be repaired. As obligations of this character were regarded an unsound basis for the re-establishment of a banking institution, the plan fell through. Finally the receiver evolved a plan—the one ultimately carried out—wherein each depositor should be paid one-third of his deposits in cash and in lieu of the balance he should be given shares of preferred stock of the company, especially issued for that purpose, and the Board of Directors should raise a fund, informally called the "guaranty fund," to which they should contribute $2,500,000 in cash and securities "to restore the present supposed capital and surplus." The character of the "guaranty fund" or of the directors' "contributions" will develop as we go along.

At the time of its failure the Trust Company held what became known as the "Segal securities," or, because of a necessary generalization, the "Segal matters," which designation included not only securities and transactions in the name of Adolph Segal but also other transactions brought about by him or in which he, in some way, directly or indirectly, was interested or had been concerned, aggregating about $5,300,000 and then having a value, so far as any one could guess, somewhere between $300,000 and $775,000. In these Segal matters, that is, among the Segal intangibles, was a claimed right of action against and a hoped-for substantial·recovery from the American Sugar Refining Company in a proposed suit for damages under the Sherman Anti-Trust·Law (15 USCA §§ 1–7, 15). Perhaps as an inducement to the directors, or certainly by a representation made to them, the receiver's plan contemplated that all "Segal matters," tangible and intangible, should be retained by, and should constitute a part of the assets or capital of, the Trust Company, subject only to the provisional payment to the contributors to the guaranty fund to be stated presently, and that it should be administered by its receiver, and later by itself, to realize an amount which would make the capital and apparent surplus whole, stated at $3,000,000, and·that any excess of moneys realized and of profits earned thereon should, "from time to time, be paid said contributors in proportion to the amounts by them respectively contributed."

The eleven directors contributed to the guaranty fund in varying sums until finally it amounted to $2,505,000.

Samuel F. Houston, on a basis of 512 shares, contributed $755,000. Of this amount, he contributed $305,000 personally on his individual share holding; he contributed $200,000 on behalf of his sister, Sallie H. Henry; and the balance on behalf of his mother and another sister.

All this was done under a formal agreement between the Trust Company and the contributing directors bearing date October 24, 1906, the stockholders assenting.

With this fund and with relief from paying the depositors more than one-third of their deposits, the Trust Company opened its doors. George H. Earle, Jr., its previous receiver and its newly-elected president, proceeded immediately to liquidate the Segal matters. Suit under the Sherman Anti-Trust Law (15 USCA §§ 1–7, 15) was instituted against the American Sugar Refining Company for triple damages—$10,000,000—on the ground that Kissel, as agent·for the American Sugar Refining Company, had made a contract with Segal in restraint of trade. This suit was compromised in 1910, and in 1911 or 1912 most of the other assets, with one very important exception, had been cleared up. That one—the major asset—was the Trust Company's interest in the Pennsylvania Sugar Refining Company, represented by 7,268 of its shares. Just what the Trust Company did in the business of the Pennsylvania Sugar Refining Company during the intervening years is not clear. At all events it held its stock, and its stock acquired a value.

In 1915 a difference of opinion arose among the contributors to the fund as to their rights in the Segal assets which resulted in an opinion by John G. Johnson, Esquire; evidently acquiesced in by all parties, indicating that the whole title to the Segal assets was vested in the Trust Company, to be handled and liquidated solely within its discretion conformably with honesty and intelligent judgment; and that all the contributors had in the Segal matters was a right, after the Trust Company had realized and credited a sum of $3,000,000, to what was left.

In 1916 the Trust Company and the contributors—all the parties interested in the Segal matters—entered into a "supplemental agreement" in respect to the distribution of annual income or dividends, not here important except perhaps to confirm and throw light on the original agreement, including the intention and expectation of a return of the guaranty fund subscribed in 1906 with profits.

In 1920 the Trust Company's primary demand for the restoration of its capital and surplus in the sum of $3,000,000 having been realized, the company and the contributors to the guaranty fund were of opinion that the liquidation agreement had rendered its maximum of service and that the values of the remaining Segal assets, shown in the latter part of that year, were the maximum which such assets could reasonably be expected to have for some time to come. So, on December 30, 1920, the company wound up the affair by distributing 7,268 shares of the common stock of the Pennsylvania Sugar Refining Company to the contributors to the fund in full satisfaction and discharge of their interest in the Segal matters.

Samuel F. Houston received, ostensibly for his portion, 548.734 shares. Of this block of stock 222 shares represented his personal proportion. The remaining shares he turned over to his relatives, under the arrangement between them, in satisfaction of their participation in his subscription.

It is not disputed that the market value of the common stock of the Pennsylvania Sugar Refining Company as of December 1920 and the early part of 1921 was $150 per share.

In computing his taxable income for the year 1920, Samuel F. Houston deducted $33,-300, the value of the 222 shares of the Pennsylvania Sugar Refining Company he had received, from $305,000, the amount of his personal contribution in 1906, and thus determined for himself and deducted a loss of $271,700. This loss was allowed by a field agent but later disallowed by the Commissioner who, on a redetermination based on the disallowance, found a deficiency and accordingly assessed against him an additional tax in the sum of $191,830.53. This is the tax which, after approval by the Board of Tax Appeals, is here for correction on the taxpayer's petition.

In order to decide whether the Board of Tax Appeals was right or wrong in approving the Commissioner's disallowance of the deduction, we must first determine whether the taxpayer's admitted loss was a deductible loss under the law and, if so, next, whether it was sustained in the taxable year 1920.

The applicable law is Section 214 (a) of the Revenue Act of 1918, 40 Stat. 1057, 1066, which provides:

"That in computing net income there shall be allowed as deductions: * * *

"(5) Losses * * * incurred in any transaction entered into for profit. * * *"

The Board of Tax Appeals in approving the Commissioner did not pass upon the question whether the taxpayer sustained a loss deductible (at some time or other) because incurred "in a transaction entered into for profit." The Commissioner, however, based his decision specifically on a finding that "no deductible loss was incurred" at any time and this, we gather from his brief, because of a claimed absence of the element of "profit" in the "transaction."

■■ As to the character of the transaction the evidence establishes beyond question that it was entered for profit. In announcing this decision we shall not recite the evidence. It

will be enough to say that the original agreement shows that interest, dividends and at least litigious profits were expected to accrue from the Segal matters; that the contributors to the fund, after the capital and surplus of the company had been made whole, "should receive from the company any excess over said amount"; that by the contemporaneous conduct of the parties, as well as by their testimony, it appears that profits were expected from suits and other sources, and, if realized beyond a fixed sum, should go to the contributors. These were not the views of "incorrigible optimists" but of business and professional men who expected a substantial, indeed a very large, recovery in the Anti-Trust suit against the American Sugar Refining Company. That their expectation failed of full realization does not destroy the element of contemplated profits or disturb the contractual undertakings of the parties with respect to them or otherwise change the character of the transaction at the time it was entered into. The character of the transaction at the time it was "entered into" continued throughout and controls. The Commissioner, however, arguing that Samuel F. Houston and the other contributors did not enter into the transaction for profit, points to the receiver's plan submitted to the stockholders of the Trust Company in which there was an appeal "to the duty and honor" of the directors as trusted representatives of the stockholders, intimating a legal liability on their part, and maintains that in making up the guaranty fund the directors acted solely through a sense of honor. Honor and business are not incompatible. A sense of honor arising from the trust reposed in them might have actuated them rather than the expectation of financial gain, yet the fact remains that the transaction was capable of yielding profits and the parties contracted in respect to them.

We hold that the loss which the taxpayer deducted in his income tax return was, at some time, a loss deductible under the law.

Was the loss sustained before the applicable revenue act?

■ The same provision of the Revenue Act of 1918, supra, allowing deductions in computing net income provided (transposing the language) that a deduction of "losses * * * incurred in any transaction entered into for profit" if "*sustained during the taxable* year" shall be allowed. The Commissioner, conceding, as he must, that the taxpayer sustained a loss at some time, says it was in-

curred in 1906 when the Trust Company failed and he and the other directors contributed their money. This contention is based on two theories; one that the payments were not made in a business transaction or in a transaction involving profit, already discussed, but were "contributed" by the directors for their honor's sake so as to save the institution with which their names were connected, and that they lost their money the instant they made their contributions. Of course, if the contributions were gratuitous, that would be true, and it would be true without regard to the motives of the contributors. But we have found that the transaction was "entered into for profit." If that be right, certainly the failure to realize profits in the future cannot establish a loss at the beginning any more than can a loss in an ordinary investment disclosed by an after-event be held to have been sustained when, years before, the unwise or unfortunate investment was entered into. Such a ruling would, if followed, overturn thousands of tax payments.

The Commissioner's other theory of his contention that the loss was suffered in 1906 is that even though there be some possibility of recoupment, which in this instance eventuated, the loss must be charged to the year in which it was actually suffered under the principle announced in United States v. S. S. White Dental Mfg. Co., 274 U. S. 398, 47 S. Ct. 598, 71 L. Ed. 1120. We accept the legal proposition and yield, of course, to the cited principle of law but find that neither is applicable to the instant case. In the White Dental Mfg. Co. Case, where the German Government had sequestered that company's property, the loss was suffered not at the beginning of a business transaction but in the course of war, and although the owner of the property later recovered a part of its value in one way and another, the transaction was closed and the loss incurred when the capture was made. In the instant case the transaction was not closed when the contributions were made. It was only begun. What would happen—whether losses would be suffered or profits gained—depended entirely on the liquidation of the Segal matters in the years to come and it was to permit that liquidation in an orderly way that the contributions were made.

We hold that the taxpayer's loss was not sustained in 1906.

When was it sustained?

Finally, the Commissioner says—and this is the specific reason which the Board of Tax Appeals gave for approving his action—that the taxpayer has failed to prove, as he was bound to do, any loss subsequent to March 1, 1913 by failing to prove the value of the taxpayer's rights in the Segal matters on that date.

The petitioning taxpayer says that his loss was sustained in the taxable year 1920 as that was the year in which, for the first time, the loss could, in the circumstances of this case, be determined, and that it could be determined then only by finding the difference between the value of what was received and the cost of his rights in the Segal matters.

The Commissioner's contention is based on the wording of like provisions in various revenue acts (here Section 202 (a) (1) of the Act of 1918 [40 Stat. 1060]) and on their judicial interpretation to the effect that the loss, if any, is the difference between what was ultimately received for the rights in 1920 and their cost in 1906, or their value on March 1, 1913, whichever was lower. Goodrich v. Edwards, United States Collector of Internal Revenue, 255 U. S. 527, 41 S. Ct. 390, 65 L. Ed. 758; Walsh v. Brewster, 255 U. S. 536, 41 S. Ct. 392, 65 L. Ed. 762; United States v. Flannery, 268 U. S. 98, 45 S. Ct. 420, 69 L. Ed. 865; McCaughn v. Ludington, 268 U. S. 106, 45 S. Ct. 423, 69 L. Ed. 868; Ayer v. Blair, 58 App. D. C. 175, 26 F.(2d) 547.

The petitioner does not question the law of those cases which is in effect that a loss in an ordinary transaction relating to property owned outright by the taxpayer and entered into before March 1, 1913, is determined by adopting either the value as of that date or the cost at the earlier date, whichever is lower, as a basis, but he maintains that all those cases deal with property having a readily ascertainable value such as real estate, instruments evidencing debt and the like, which is different from ascertaining a loss under a right of the character here involved where the result of the venture could not be known until the Segal matters had been liquidated and where, therefore, the loss of a guarantor, or the value of his correlative right to reimbursement, is not ascertainable until the guaranty transaction is liquidated and where, until then, no ascertainable loss had occurred.

To work out this aspect of the question it will be necessary to determine generally the interest of the contributors and particularly the petitioner's interest in the Segal matters. It is, because of their nature, dif-

ficult to give them a legal definition. Speaking of them in the singular number, it is certain that the petitioning contributor had no legal interest in the Segal securities or matters, or any legal claim to them. Legal title and the right fully to dispose of them was exclusively in the Trust Company. The petitioner had, however, a right to a share of the residue of the proceeds of their liquidation, whether in cash or its equivalent. That right was in the nature of a chose in action yet a very restricted chose in action which he could not enforce until liquidation of the Segal matters had been fully completed, whenever that should be. The right, being a chose in action, was property. Being property, it was subject to disposition through testacy, intestacy and sale, which, so far as the record shows, did not occur in any instance. Being a right in property it had a value, potential at least, and a value, varying perhaps in mental contemplation, which persisted throughout the fourteen years it was held. Confessedly, it had, after the beginning and throughout that period, no market value for there were no sales. Nor did it, conceivably, have an ascertainable intrinsic value. Therefore it had no calculable tax value. The value of the right immediately after the beginning and to the very end depended on what the Trust Company had done with the Segal matters, what it was doing with them and what it would do with them in the future, and, finally, what in the future would be the outcome. To determine, in view of these variable factors, or lack of factors, its true or approximate value on a given date, as that of March 1, 1913 selected by the Commissioner as the basis of the tax calculation, was a sheer impossibility. The only fixed factors in the situation were those of cost in 1906 and return in 1920. It follows that the proper basis for measuring the petitioner's admitted loss—because the only possible basis—was that of cost and return. While by force of statute and judicial decisions March 1, 1913 is, in given instances, a critical date in computing income taxes, it is not in every instance a controlling date. If in this case the taxpayer had claimed a loss in 1913 on this transaction, he would, without doubt, have been met by the Commissioner's ruling and the decision of the Board of Tax Appeals that he was anticipating a loss because the transaction was not closed; while on the other hand if the taxpayer had, after March 1, 1913, sold his right in the Segal matters at a figure which showed a profit over cost in 1906, though its value on March 1,

1913 could not be ascertained, the government would, we surmise, have exacted a tax on the profit. This is not an exaggerated illustration for if the recovery from the American Sugar Refining Company had been for the $10,000,000 demanded there would have been profits—indeed very large profits—coming to the contributors to the guaranty fund.

We are constrained to hold that the petitioner suffered a deductible loss, that it was sustained by him in 1920 and that the amount of the loss was properly determined by him to be the difference between his subscription to the guaranty fund in 1906—cost—and the value of his pro-rata share of the proceeds of that fund when received by him in 1920.

The order of redetermination made by the United States Board of Tax Appeals is reversed, the additional tax determined by the Commissioner set aside, and the income tax return of the petitioner, in so far as it is affected by the claimed deduction here in question, approved.