## PAGE v. RHODE ISLAND HOSPITAL TRUST CO.
### No. 3184.

Circuit Court of Appeals, First Circuit.

Feb. 12, 1937.

Edward H. Horton, Sp. Asst. to Atty. Gen. (Robert H. Jackson, Asst. Atty. Gen., Sewall Key, Norman D. Keller, and Samuel E. Blackham, Sp. Assts. to Atty. Gen., and J. Howard McGrath, U. S. Atty., of Providence, R. I., on the brief), for appellant.

James F. Armstrong, of Providence, R. I. (Harold A. Andrews and Hinckley, Allen, Tillinghast & Wheeler, all of Providence, R. I., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This is an appeal from a judgment of the District Court of Rhode Island in an action to recover alleged overpayment of income taxes by the plaintiff's testator, Henry Pearce, Jr., for the year 1928.

Plaintiff's testator had for several years prior to 1924 purchased and sold securities on the New York Exchange through Harriman & Co., as brokers, with whom he had what is termed in brokerage circles a "margin account." During that time he was supposed to maintain with the brokers, either in the form of cash or securities, a margin equal to at least 10 per cent. of the cost of the securities purchased on his account.

For some reason, the brokers permitted the plaintiff's testator to purchase securities to a large amount without requiring the customary margin, and as a result, in the falling market following the World War, plaintiff's testator became indebted to his brokers in large amounts by reason of the sale of securities at less than cost.

In 1919 the excess of the cost over the selling price of securities carried for him by his brokers on his account and

sold during that year was $125,030.33. In 1923 the excess of cost over the selling price of securities carried for him by his brokers and sold during that year was $124,363.50; and in 1924 the excess of cost over the selling price of securities carried for him and sold by his brokers was $19,525, or a total of $268,918.83.

During 1923 plaintiff's testator reduced his account with his brokers by payments to the amount of $133,899.40. During the year 1924 his brokers purchased on his account 2,500 shares of Corn Products for the sum of $84,687.50, bringing his indebtedness to his brokers up to $218,409.05, for which he gave his brokers two promissory notes on six months' time, one for $150,000 and the other for $68,409.05.

These notes were renewed at each maturity thereof until 1928, when the Corn Products stock was sold by his brokers to meet these notes for $217,912.50. To close the account which had increased somewhat by reason of interest charges and an allowance of an agreed underpayment of income tax in the year 1926, the plaintiff's testator paid to the brokers in addition to the amount received from the sale of Corn Products the sum of $4,074.92.

The District Court found that it was not the usual type of "margin account" where the customer had kept his "margin" up to 10 per cent. of the cost of the stocks carried for him, but was a heavily "under-margined" account, and when the securities were sold in 1919, 1923, and 1924, there was no equity in any securities held on "margin" by the brokers for the customer to offset the loss on the sales, and the brokers were obliged to carry the customer as a debtor to the extent of approximately $134,500, which the District Court found the plaintiff's testator was unable to discharge. The plaintiff's testator gave his notes for this amount, plus the cost of the 2,500 shares of Corn Products stock, with an assignment of interest in a certain trust estate as collateral security for this debt.

The question is, with a customer's account in which there was no equity to apply in settlement of any losses from the sale of securities, and the customer's notes being given for the debt owing to the brokers, whether there was any deductible loss "paid or accrued" within the meaning of section 43 of the 1928 Act (26 U.S.C.A. § 43 and note), until the final adjustment of the debt upon the sale of the Corn Products stock in 1928.

The plaintiff's testator made his returns on a cash receipts and disbursements basis. While apparently he filed a return in 1919, 1923, and 1924 showing his losses by reason of the sales of securities, other losses offset all gains for each of these years, and the inclusion by the taxpayer of the losses above referred to for either of these years was error, inasmuch as they still remained an undischarged debt and not a deductible loss.

Nor did the giving of notes for these losses constitute a payment thereof so as to create a deductible loss. To be deductible a loss must be paid in cash or its equivalent. There must be an actual depletion of the property of the taxpayer. The giving of a note for losses is not sufficient to permit a deduction.

"If the note is never paid, the taxpayer has parted with nothing more than his promise to pay. A promise to pay is not cash, and a deduction * * * is permissible only in the taxable year in which the taxpayer pays cash." Hart v. Commissioner (C.C.A.) 54 F.(2d) 848, 852.

"The mere existence of liability is not enough to establish a deductible loss. There is liability in the case of a breach of contract, but as the Court said in Lucas v. American Code Co., 280 U.S. 445, 450 [50 S.Ct. 202, 203, 74 L.Ed. 538 [67 A.L.R. 1010], 'even an unquestionable breach does not result in loss, if the injured party forgives or refrains from prosecuting his claim.'" Burnet v. Huff et al., 288 U.S. 156, 160, 53 S.Ct. 330, 331, 77 L.Ed. 670.

In Eckert v. Burnet, 283 U.S. 140, 141, 142, 51 S.Ct. 373, 374, 75 L.Ed. 911, the court said:

"A deduction may be permissible in the taxable year in which the petitioner pays cash. The petitioner says that it was definitely ascertained in 1925 that the petitioner would sustain the losses in question. So it was, if the petitioner ultimately pays his note."

So in the instant case, it was apparent that the taxpayer sustained a loss, provided he paid his notes. He did not discharge his debt until the year 1928, and from the receipts of the sale of the Corn Products stock.

The cases of Osterloh v. Lucas (C.C.A.) 37 F.(2d) 277, North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197, Lucas v. Providence Coal Mining Co. (C.C.A.) 60 F.(2d) 86, 87, Insurance Finance Corporation v. Commissioner (C.C.A.) 84 F.(2d) 382, are all cases where the actual loss could be identified as occurring in one year, but it could not be deductible until a later year or years.

While, as claimed by the government, sales of stock are ordinarily sufficient to identify losses as occurring in a certain year, in the case of "grossly under-margined" account, as in this case, the loss merely represents a debt due a broker from the customer. Until there is a reimbursement of the broker, there is no certainty that the customer and taxpayer will ever actually suffer a loss within the purview of the Revenue Act, especially when the loss is carried along from year to year in the form of notes which may or may not ever be paid, or which the payee may never see fit to enforce.

Cases which merely hold that losses are deductible in the year in which they are identifiable, have no application to a case where, though they occurred in a certain year from the sale of securities by a broker, there is no margin account on which they can be recouped and there is no certainty that the customer will ever be able to make restitution to the broker for the loss in case of a "grossly undermargined" account. The mere liability for a loss is not sufficient to permit a deduction. Lucas v. American Code Company, supra. It can only be deducted when the customer has in effect discharged the debt incurred by his broker in his behalf.

The government seeks to differentiate the above cases, but we think they clearly show that where the taxpayer makes return on a cash receipts and disbursements basis, and the losses from the sale of securities have become merely an obligation of the customer, the customer cannot deduct such indebtedness as a loss until he has actually discharged it. In case of an "under-margined" account, the sale of the securities results in a loss to the broker, unless the customer at some later time is able to make good the indebtedness resulting. The usual case of broker and customer, where the broker has required that the customary 10 per cent. margin be maintained by the customer does not apply here. In such cases the loss on the sale of securities would be immediately charged against the "margin account" of the customer and as a result actual depletion of the customer's property and a deductible loss would follow.

Here the loss on sale of securities is represented merely by the indebtedness of the customer, and in the form of notes. If paid, a deductible loss to the customer occurs as of the date of payment. If they should never be paid, as in case of bankruptcy, they become merely a bad debt of the broker which he may deduct in his return during the year when it is shown that it is uncollectible. In such case the customer should not also have the benefit of a deduction.

The judgment of the District Court is affirmed with costs of this court.