## TAMS v. UNITED STATES.
### Civ. No. 56.

District Court, S. D. West Virginia.
June 18, 1940.

Tams, Raleigh County, West Virginia, within the jurisdiction of the United States District Court for the Southern District of West Virginia.

(2) The amount involved in this controversy is less than $10,000.

(3) Plaintiff, W. P. Tams, is a mining engineer and coal operator of long experience and outstanding ability. In 1920, he and one J. B. Clifton (now deceased) organized and incorporated Guyan Collieries Corporation (hereinafter called the "Company"), for the purpose of acquiring coal properties and engaging in the business of mining and selling coal. Operations began in 1920, and continued until the Spring of 1931. The Company acquired the fee or mineral rights in approximately 5,000 acres of land, and approximately $1,000,000 was invested in the purchase and development of these properties. The operations of the Company were profitable only in the years 1922 and 1923, and no dividends were ever paid on its stock.

In the Spring of 1931, the Company was not operating at a profit, it owed debts of approximately $47,000, had no cash to satisfy these debts, and its creditors were threatening to obtain judgments. On April 26, 1931, upon the petition of plaintiff, then a vice-president and director of the Company, and other stockholders, a receiver for the Company was appointed by a West Virginia state court, the Company having discontinued operations on April 16, 1931.

On April 28, 1931, two days after the institution of the suit, a letter was sent to the stockholders of the Company and its creditors, by order of the Board of Directors, enclosing a copy of the receivership decree, and stating: "It is anticipated that creditors will be paid in full, and that a substantial amount of assets will be left for distribution among the stockholders."

The Company's coal properties generally comprized two tracts, referred to as the "Upper" and "Lower" tracts. Coal deposits on the Upper Tract were considered by plaintiff and others to be more valuable than those on the Lower Tract, but operations had been conducted only on the Lower Tract because the Upper Tract was inaccessible to any railroad. At the time the receivership suit was instituted, there were good prospects of a railroad extension being built into, or

Frederick L. Thomas, of Charleston, W. Va. (Price, Smith & Spilman, of Charleston, W. Va., on the brief), for plaintiff.

Charles M. Love, Jr., Asst. U. S. Atty., of Charleston, W. Va., and Julian G. Gibbs, Sp. Asst. to Atty. Gen. (Lemuel R. Via, U. S. Atty., of Huntington, W. Va., and Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe, Sp. Asst. to Atty. Gen., on the brief), for defendant.

### Findings of Fact.

BARKSDALE, District Judge.

(1) Plaintiff was at all times mentioned in his complaint, and is now, a citizen of the United States, residing at

accessible to, the Upper Tract so as to permit coal operations upon it. These facts were known to plaintiff and other officers of the Company, and the railroad extension was later built.

The Company, when the receivership suit was filed, owned certain lumber, houses, machinery and other property which its officers thought could be sold by a receiver for a substantial sum and applied to the payment of its debts in an orderly fashion in the receivership suit. However, the receiver was unable to obtain sufficient money to pay the Company's debts, so on May 27, 1932, the Company's charter was forfeited for failure to pay fees due the state. On August 22, 1932, the State Court entered a decree dissolving the corporation and directing that its assets be sold. On November 14 and 15, 1932, the assets of the Company were sold to the creditors for approximately $27,000.

There was a meeting of stockholders after this sale, and a committee was appointed to try to save the Company's property, and confirmation of the sale was delayed, from November 15, 1932, until March 17, 1933, while this committee tried to save the property. However, during that time the coal industry in this section was undergoing a severe depression, and the committee being unable to evolve any expedient for saving the property, the sale thereof was confirmed by the Court on March 17, 1933.

During the entire pendency of the receivership suit, plaintiff was active in the endeavor to assist the receiver in working out the affairs of the Company so that it would not be necessary to sacrifice its mineral rights. After the sale of the Company's assets on November 14 and 15, 1932, plaintiff notified the commissioners who sold the property, by letter of November 21, 1932, that an upset bid was being proposed. Plaintiff was unable to persuade other stockholders to join him in the making of an upset bid, but by letter of March 13, 1933, he protested to the commissioners that the sale should not be confirmed by the court because the price was inadequate.

(4) When the Company was being organized, H. McK. Smith, of Staunton, Virginia, a friend and relative of plaintiff, asked plaintiff to permit him and his friends to purchase some of the Company's stock. Plaintiff agreed, and Mr. Smith bought some stock for himself and sold other stock to his friends, in the aggregate of 810 shares of the preferred stock of the Company, of the par value of $100 per share.

On July 7, 1931, plaintiff was in Staunton, of which city he was a native, and found that the stockholders there, having been informed of the receivership, were anxious for information about the affairs of the Company. A meeting was arranged, and plaintiff informed these stockholders that he thought the debts of the Company would be paid off in the receivership proceeding, and that the stockholders would ultimately receive all the money invested by them with interest. However, the stockholders were skeptical, and plaintiff offered to repurchase their stock from them, at par, payable $5 per share per year for twenty years, without interest, with the right to the stockholders to repurchase at any time within five years. The stock was not actually transferred on the books of the Company because plaintiff believed that most, if not all, of the stockholders would repurchase within the five-year period. None of them exercised their right of repurchase, and plaintiff made his first payment on account of the purchase of the stock in October, 1931, and has continued to make payments of $5 per share per year, as agreed, each year thereafter until the present time, such payments amounting to the sum of $4,050 annually. At and before the time of this purchase agreement, plaintiff was vice-president and a director of the Company and owned 425 shares of its 9,750 shares of preferred stock issued and outstanding.

(5) Calculated at 6%, the purchase price of the stock purchased by plaintiff from the Staunton stockholders, according to the terms agreed upon, had a present worth as of the date of purchase of $59 per share. The stock at that time had a book value of not less than $68 per share and not more than $98 per share.

(6) In December, 1931, one stockholder sold 56 shares of the preferred stock of the Company for $5 per share.

(7) Plaintiff was not engaged in the trade or business of buying and selling stocks in the year 1931 or in any other year material to this action.

(8) Plaintiff has made no sale or disposition of the stock purchased by him from the Staunton stockholders.

(9) Plaintiff was on the Cash Receipts and Disbursements basis of accounting, and prepared and filed his income tax returns for the calendar years 1934, 1935 and 1936 on a Cash basis.

(10) Plaintiff duly filed, with the proper collector of internal revenue, income tax returns for the following years on the following dates, and duly paid income taxes as follows:

| Year | Return Filed | Net Income | Tax Paid | Date of Final Payment. |
|---|---|---|---|---|
| 1934 | February 27, 1935 | $50,060.03 | $ 7,705.69 | December 9, 1935 |
| 1935 | February 8, 1936 | 67,416.71 | 13,404.76 | December 3, 1936 |
| 1936 | March 13, 1937 | 90,140.88 | 27,351.49 | December 13, 1937 |

For the year 1934, an income tax deficiency of $118.40, with interest, was assessed against plaintiff and duly paid by him. For the year 1935, a certificate of over-assessment in the amount of $569.-44, with interest, was issued in favor of plaintiff, and the amount duly paid to him.

(11) On February 8, 1938, plaintiff filed his claims for refund of income taxes paid for the calendar years 1934, 1935 and 1936 in the respective amounts of $1,255.50, $1,576.48 and $2,227.50. The ground stated in each of these claims as a basis of refund, was the failure to deduct losses caused by installment payments during the years 1934, 1935 and 1936 on the contract made on July 7, 1931, to purchase said 810 shares of stock, from the Staunton stockholders, alleged to have become worthless in the year 1933. More than six months elapsed after the filing of said claims and before the institution of this suit, without action thereon by the Commissioner of Internal Revenue. These claims were rejected by the Commissioner of Internal Revenue under date of September 13, 1939. This suit is for the recovery of the alleged overpayments set out above, with interest.

(12) In his income tax return for the year 1931, plaintiff claimed a deduction for the loss sustained by him by reason of the fact that his 425 shares of stock in the Company became worthless during that year, which deduction was allowed him by the Commissioner of Internal Revenue.

### Conclusions of Law.

The plaintiff here bases his action upon Section 23 (e) (2) of the Revenue Act of 1928, 26 U.S.C.A.Int.Rev.Code § 23 (e) (2). In the Revenue Acts in force in all of the years here involved, this section is found identically as follows:

"Sec. 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

* * *

"(e) *Losses by individuals.* In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—* * *

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *."

In my opinion, a proper decision of this case requires five conclusions of law which involve, in effect, arriving at the correct answers to five somewhat interrelated and interdependent legal questions. I shall undertake to answer these questions seriatim:

### Conclusion No. 1.

The first question to be determined, is whether or not the 810 shares of preferred stock of Guyan Collieries Corporation purchased by plaintiff from the Staunton stockholders on July 7, 1931, had any value on the date of such purchase. An affirmative answer to this question is essential to plaintiff's case, for if the stock on that date had no value, the purchase could not have been "for profit". The question of when the value of property becomes extinct, is considered, and legal principles stated for determining this question, in the following cases, amongst others: Rosing v. Corwin, 2 Cir., 88 F.2d 415; Brown v. Commissioner, 6 Cir., 94 F.2d 101; Rhodes v. Commissioner, 6 Cir., 100 F.2d 966; Lucas v. American Code Company, 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010; and United States v. S. S. White Dental Company, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120. It is said, that the question calls for a practical, and not a legal test, that cessation of business is not conclusive to show worthlessness of stock, and generally, that no legal rule, but common

sense, should govern the determination of the time of the extinction of value.

▮▮ Here, the burden is on the plaintiff to establish that on July 7, 1931, the stock purchased by him had some value. Ordinarily, in cases where a litigant is endeavoring to establish a deductible loss at a given time, he is required to prove some "identifiable event" as establishing the loss. Here, the Government contends that the appointment of a receiver for this Company in April, 1931, is such identifiable event. In support of this contention, there are also the facts that this company, at the time of the receivership, was operating at a loss, that it had only had two profitable years between its formation in 1920 and the receivership in 1931, and had never paid dividends on its stock; also, at the time of the receivership, it had pressing debts and found itself unable to raise the cash to pay off the comparatively small indebtedness of $47,000.

▮ However, I am unable to conclude that these facts demonstrate that the stock was worthless on July 7, 1931. The Company owned valuable and unencumbered coal properties, for which and the development thereof the Company had paid out approximately $1,000,000 in money. A railroad extension was in prospect which would permit the Company to begin coal operations on the most valuable part of its property. The receivership was instituted by the stockholders themselves in the obvious belief that they could salvage a large part of their property. Efforts were made by the plaintiff and other stockholders to liquidate the Company's indebtedness without sacrificing their property; and to permit the stockholders to make these efforts, the order for the sale of the properties was deferred until August 22, 1932, the sale was deferred until November 14 and 15, 1932, and the confirmation thereof was deferred until March 17, 1933. At the time of plaintiff's purchase, the stock had a book value of at least $68 per share, and as late as December, 1931, some of the stock was actually sold for $5 per share. Therefore, I think the plaintiff has borne the burden of proof and I conclude that, although it must be conceded that the Company was in financial difficulties and its stock certainly not worth its par value, nevertheless, on July 7, 1931, the stock was not worthless, but on the other hand did have a quite substantial value.

*Conclusion No. 2.*

▮ Assuming that on July 7, 1931, this stock did have some value, was plaintiff's purchase of the Staunton stock a "transaction entered into for profit, though not connected" with his trade or business? I am here assuming that this purchase was not in plaintiff's trade or business, as he was essentially a coal operator rather than a dealer in coal stock. This assumption may not be justified, as the purchase and sale of coal stocks is certainly closely related to the business of a coal operator. However, I do not find it necessary to pursue this inquiry, because it is my conclusion that, even though it be conceded that the transaction was not connected with plaintiff's trade or business, it was a transaction entered into "for profit". The only direct evidence in the case bearing on plaintiff's motive for making this purchase, is his own testimony, in which he says, in effect, that he thought the stock was well worth what he agreed to pay for it and that he expected to make a profit from the transaction. I have the utmost regard for plaintiff's honesty and frankness, but I am constrained to believe that he was, perhaps subconsciously, in some degree actuated by the desire to reimburse Mr. Smith and Mr. Smith's friends for money which they had invested, relying, I think, solely on their confidence in, and respect for, Mr. Tams' judgment and ability as a coal operator. If Mr. Tams had been actuated solely by the profit motive, he would hardly have given his vendors the right to repurchase their stock at any time within five years.

This presents a situation quite analogous to that presented in Houston v. Commissioner, 3 Cir., 39 F.2d 351, where certain Philadelphia gentlemen, after an appeal had been made to their sense of honor and duty, put up very considerable sums of money to relieve a distressed banking house of which they were directors, taking therefor pro rata shares in the residuum of certain personal property and choses in action of relatively small actual, but large potential value, after the capital and surplus of the institution should have been made whole from the same assets.

These assets were liquidated in a sufficient amount to make whole the capital

and surplus of the institution and leave a balance which was distributed pro rata to the directors. Upon receipt of his pro rata share, the plaintiff, one of the directors, deducted the value of his pro rata share from the amount which he had put up, and claimed his loss as a deduction from his income tax for the year in which he had received his pro rata share of the distribution.

The Court, after observing that, "Honor and business are not incompatible", held that, although the plaintiff and the other directors might have been actuated by the desire to live up to the trust imposed in them, nevertheless the transaction was one capable of producing profit and was therefore a transaction "for profit" within the meaning of the statute.

The case of Dresser v. United States, Ct.Cl., 55 F.2d 499, 510, relied upon by the defendant on this point, seems to me to be clearly distinguishable. There, the evidence established, and the court found as a fact, that plaintiff's decedent was familiar with the affairs and conditions of the business of the corporations the stocks of which were involved, and that his acquisitions thereof were not transactions entered into for profit, because the stocks were worthless when acquired. In fact, it would seem that the plaintiffs relied upon the worthlessness of the stocks at the time of their acquisition as a basis of their claims for deduction. The court properly said: "If a taxpayer chooses to pay or contribute money in any transaction, which, under all the circumstances known to him at the time, is a hopeless venture, and from which he has no reasonable expectation of profit, he is not entitled to take the amounts paid or contributed as a deduction from income for tax purposes. A loss, in order to be deductible under the statute, must be an unintentional parting with something of value."

In the instant case, the plaintiff's testimony is to the effect that at the time of his purchase he was satisfied that the stock did have value, was worth what he agreed to pay for it, and he hoped and expected that the transaction would prove profitable to him. This testimony, together with the facts set out as my reasons for concluding that the stock had value on the date of its purchase by plaintiff, seem to me to clearly distinguish the Dresser case from the case here presented.

I am of the opinion that the case of Houston v. Commissioner, supra, is controlling here, rather than the case of Dresser v. United States, supra, and I therefore reach the conclusion that plaintiff's purchase of the stock of the Staunton stockholders on July 7, 1931, was a transaction entered into "for profit".

*Conclusion No. 3.*

Having reached the conclusion that the stock purchased by plaintiff from the Staunton stockholders on July 7, 1931, did on that date have some value, and the further conclusion that this was a transaction entered into "for profit", it now becomes necessary to determine whether or not the stock did become worthless, so as to render plaintiff's payments therefor a loss, before or during the calendar tax year 1934, the first year for which plaintiff claims that such payments constituted deductible losses in this suit. In my view of the law applicable to this case, as will subsequently appear, a determination of the exact date upon which the value of this stock became extinct is not necessary for a decision of the case, and any determination thereof on my part would be merely an obiter dictum. It would seem, however, to be a very simple matter to determine that this stock was totally without value before the beginning of the calendar year 1934. A receiver was appointed for the Company on April 6, 1931. Strenuous efforts were made to relieve the financial difficulties of the Company, without success, and notwithstanding such efforts the Company's charter was forfeited on May 27, 1932, its dissolution and a sale of its assets were decreed on August 22, 1932, its assets were sold on November 14 and 15, 1932, and the sale thereof was confirmed by a court of competent jurisdiction on March 17, 1933. No appeal was taken from the decree of confirmation, and it would seem that on and after the date when the order of March 17, 1933, confirming the sale of all the Company's assets, became final, not even the most incorrigible of optimists would have considered stock in this company to have any value. Therefore, I reach the conclusion that the stock of this company became totally worthless prior to the beginning of the calendar year 1934.

*Conclusion No. 4.*

Assuming that the plaintiff was on the cash receipts and disbursements basis of accounting and filed his tax returns during all the years here involved on the cash basis, and made his payments for the stock purchased from the Staunton stockholders, at the rate of $4,050 per year, annually, was he obliged to deduct his entire loss on the transaction in the calendar year during which the stock became worthless, or was he entitled to deductions in each of the years 1934, 1935 and 1936 in the sum of $4,050, the amount paid by him for the worthless stock in each of the years mentioned?

Defendant contends that the stock became worthless, and the entire loss was incurred, in 1931, and that if plaintiff was ever entitled to a deduction therefor he could only deduct it in the year 1931. In support of its contention, defendant cites Weis v. Commissioner, 13 B.T.A. 1284, undertakes to distinguish Eckert v. Burnet, 283 U.S. 140, 51 S.Ct. 373, 75 L.Ed. 911, and also cites Spring City Co. v. Commissioner, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200.

If defendant's contention were sound, it would apply, whether the stock became worthless in 1931, or in some subsequent year. But I do not think it is sound. Defendant relies primarily on Weis v. Commissioner, supra, which, in brief, holds that where a taxpayer on the cash basis actually liquidates a loss with borrowed money, he must take his deduction when he liquidates his loss, irrespective of when he repays his borrowed money. That principle is, I think, entirely sound, but inapplicable here.

The instant case is governed by Eckert v. Burnet, supra, Jenkins v. Bitgood, 2 Cir., 101 F.2d 17, and the recent case of Helvering v. Price, 60 S.Ct. 673, 84 L.Ed. ——, Mar. 25, 1940, which reaffirms both. See also Page v. Rhode Island Hospital Trust Company, 1 Cir., 88 F.2d 192, 121 A.L.R. 693. The principle which these cases enunciate, is that a taxpayer on the cash basis who purchases property which later becomes worthless, payment for which is to be made in the future, can only deduct his loss when his debt is liquidated by cash or its equivalent, irrespective of when the property becomes worthless, this being true even though in an earlier year he gives his secured note to cover his indebtedness; or, in other words, the year when the deduction is allowable to a taxpayer on the cash basis is not necessarily the year in which the stock becomes worthless, nor the year when he recognizes the debt and gives his note or even his secured note, but it is the year, after, or within which, the property becomes worthless and within which he liquidates the debt by the payment of cash or its equivalent. The time of liquidation by cash or its equivalent is the criterion.

Applying this principle to the instant case, I conclude that the plaintiff here could not have taken his entire loss on his stock purchase in the year in which the stock became worthless, but was obliged to claim his deductions in the years in which he actually paid out cash on account of his purchase, as he is here seeking to do.

*Conclusion No. 5.*

There remains only the question of estoppel. For the tax year 1931, the plaintiff, on the advice of an accountant who prepared his income tax return for him, claimed, and was allowed, a deduction for the loss of the purchase price paid by him for 425 shares of stock in this same company, upon the ground that the same became worthless in the year 1931. Defendant contends that this action estops the plaintiff from claiming, as he does here contend, that the 810 shares of stock in the company purchased from the Staunton stockholders had value when purchased on July 7, 1931.

It does seem somewhat incongruous to permit a taxpayer to successfully assert that stock in a certain company had value during a certain calendar year, when the same taxpayer has been permitted to successfully assert that the same stock was worthless some time during the same calendar year. But upon a closer consideration, this inconsistency becomes more apparent than real. If the defendant be right in its contention of estoppel (which I expressly do not decide, such decision being unnecessary), in my opinion it has no right to bind the plaintiff any further than by his own statement or action he has bound himself, and the most that can be said of the plaintiff's action in claiming a deduction based on the worthlessness of his stock in this company in 1931, is, that he has said, and

the Commissioner has accepted as true, that the stock of the Guyan Collieries Corporation became worthless sometime during that calendar year, not later than December 30, 1931. That is not inconsistent with the position which he takes here, which is, that on July 7, 1931, nearly six months before the end of the year, this stock did have some value. I therefore conclude that the plaintiff is not precluded by estoppel from asserting the claim set out in this action.

It therefore follows, from the findings of fact and conclusions of law set out above, that I am of the opinion that the plaintiff should recover the overpayments of income taxes asserted in his complaint, with interest thereon from the date of final payment of income taxes in each year here involved, and an order will be drawn accordingly.