## BURNET, COMMISSIONER OF INTERNAL REVENUE, *v.* HUFF ET AL.

No. 58. Argued December 6, 1932.—Decided February 6, 1933.

*Mr. Paul D. Miller,* with whom *Solicitor General Thacher, Assistant Attorney General Youngquist,* and *Messrs. Sewall Key* and *Andrew D. Sharpe* were on the brief, for petitioner.

*Mr. Harry C. Weeks* for respondents.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

In computing net income for 1920, the respondents, R. E. Huff, and his wife, E. B. Huff (now deceased), sought deduction of a loss alleged to have been sustained in that year, in relation to community property, through the embezzlement of trust funds. The funds were held by a partnership of which R. E. Huff was a member and were embezzled by his copartner. The Commissioner disallowed the deduction, holding that as the funds were not the property of the petitioners, and they were not called upon to make good the amount embezzled until 1921, they sustained no loss in 1920. The Board of Tax Appeals, upon the authority of *Farish & Co.* v. *Commissioner* (C. C. A. 8th), 31 F. (2d) 79, upheld this ruling. An alternative claim, for the deduction of the amount in question as a worthless debt, was also disallowed. 20 B. T. A. 516. The Circuit Court of Appeals, declining to

follow the *Farish* case, reversed the decision of the Board, 56 F. (2d) 788, and this Court granted certiorari.

The pertinent facts as found by the Board of Tax Appeals are these: R. E. Huff, a lawyer and banker in Wichita Falls, Texas, and J. S. Mabry were copartners engaged in managing the business of a reciprocal fire insurance association known as Wichita Great Western Underwriters. Under the plan of organization, 25 per cent. of the gross premium income of the association was allotted to expenses and profits, and the remaining 75 per cent. was to be set apart as a reserve to pay fire losses. Any person might become an 'underwriter' by subscribing to the association such amount as he wished to invest, paying one-fourth in cash. Ten per. cent. of the cash payment was allowed to the managing attorneys and the rest constituted a reserve or trust fund which was to remain the property of the underwriters and to be used only for the payment of fire losses in excess of the association's reserve. An advisory board was created for safeguarding the interests of the subscribers but undertook no active supervision until about the end of 1920. The board looked to Huff for the proper conduct of the affairs of the association, but the management was left almost entirely to Mabry. Early in 1920, on Mabry's representation that the sum of $25,000 was needed for working capital, Huff advanced this amount to the partnership upon partnership notes payable in six months. The entire amount was repaid to Huff in the autumn of 1920 by checks drawn by Mabry, the money being taken from the trust fund of the association held in reserve for the subscribing underwriters. Huff and Mabry were not the owners of that fund and neither of them had authority to use it for any purpose other than the payment of fire losses. To cover the checks, given to repay Huff, Mabry gave a demand note signed in the firm name in favor of the reserve fund. Mabry had no authority to execute the note and Huff did not know until near the end of 1920

that the note had been given or that the repayment to him had not been made from funds belonging to the firm. The unauthorized use of the trust fund was discovered, in the absence of Mabry, in December, 1920. On Mabry's return in January, 1921, he was removed as one of the managing attorneys and the firm then discontinued business. Mabry promised to pay back the money he had taken but did not do so, and a judgment against him would have been worthless. Huff was unable to determine the amount of the assets of the firm of Huff & Mabry before the close of 1920, and in February, 1921, these assets, amounting to $3,228.65, were turned over by Huff to the association, together with $21,771.35 which he paid personally. He has not been reimbursed. Huff kept no regular books of account and made up his income tax returns upon a cash receipts and disbursements basis.

*First.* The Revenue Act of 1918 (40 Stat. 1057, 1066, 1067) provided for the deduction of losses incurred " in trade or business " or " in any transaction entered into for profit," or arising from theft of property "not connected with the trade or business," when the losses were "sustained during the taxable year " and were " not compensated for by insurance or otherwise." § 214 (a) (4) (5) (6).

The Government concedes that if assets of the taxpayer used in trade or business, or " in any transaction entered into for profit," are stolen in any year, the taxpayer sustains the loss in that year and the deduction must then be taken even though the theft is not discovered or the amount ascertained until the following year. This is said to be the import of the regulation adopted by the Treasury Department under the Revenue Act of 1921. Regulations No. 45, Art. 111.[1] But the Government contends

[1] Article 111 of Regulations No. 45 provides: " A loss from theft or embezzlement occurring in one year and discovered in another is deductible only for the year of its occurrence. . . . If subsequently to its occurrence, however, a taxpayer first ascertains the amount of a loss sustained during a prior taxable year which has not been deducted

that a different rule applies (at least where the taxpayer is on a cash basis) when the property stolen is not that of the taxpayer but is held by him in trust, and the theft is not discovered until the following year, as in that case "the taxpayer, being nothing out of pocket, cannot be said to have 'sustained' the loss in the year of the theft." The Government also raises the question whether Huff, in the absence of a finding of negligence, or of improper delegation of the administration of the trust to Mabry, can be regarded as legally bound to make restitution. Respondents insist that Huff was "liable for the trust funds" from the moment they were received by his firm, and that the loss was sustained at the time of the embezzlement because it deprived him of assets with which he could have discharged his obligation.

We find it unnecessary to discuss the question whether Huff was bound to make good the amount taken from the funds of the association by his copartner. We may assume that he was. But the mere existence of liability is not enough to establish a deductible loss. There is liability in the case of a breach of contract, but as the Court said in *Lucas* v. *American Code Co.*, 280 U. S. 445, 450, "even an unquestionable breach does not result in loss if the injured party forgives or refrains from prosecuting his claim." And whether a taxpayer will actually sustain a loss through embezzlement of trust funds of which he is trustee will depend upon a variety of circumstances. If there is liability on his part for the misappropriation, it does not create a certainty of loss, as the defalcation may be made good by the one who caused it,

from gross income, he may render an amended return for such preceding taxable year, including such amount of loss in the deductions from gross income, and may file a claim for refund of the excess tax paid by reason of the failure to deduct such loss in the original return." See, also, Regulations No. 62, Art. 111; No. 65, Art. 112; No. 69, Art. 112; No. 74, Art. 342.

or the liability of the taxpayer may be enforced only to a limited extent or not at all. The requirement that losses be deducted in the year in which they are sustained calls for a practical test. The loss "must be actual and present." *Weiss* v. *Wiener*, 279 U. S. 333, 335; *Lucas* v. *American Code Co.*, supra; *Eckert* v. *Burnet*, 283 U. S. 140, 141, 142.

The instant case aptly illustrates the importance of this principle and calls for its application. Huff himself received the entire amount embezzled. He received this amount in payment of notes given to him by his firm to cover his advances to the firm. If he was liable to restore the amount taken from the trust fund, he himself had the full sum that was to be restored. So far as his individual estate was concerned, he had lost nothing by the embezzlement. If Huff had learned of the embezzlement immediately upon the payment to him and had at once restored the entire amount to the trust fund, he would have been in the same position as that in which he was before he received the money; that is, he would have held the partnership notes, for his advances to the partnership, which had not been properly discharged. Huff's personal wealth would have remained the same as it was prior to the embezzlement, and his individual gains or losses would have turned not upon the embezzlement but upon the result of the partnership business. When, in 1921, on the liquidation of that business, Huff turned over to the association the sum of $21,771.35, he was merely restoring part of what he himself had received of the misappropriated fund, and whatever loss he sustained was upon his investment in, or his advances to, his firm. That loss was determinable only through the winding up of the partnership business.

The result of the partnership transactions was not known and could not be ascertained in 1920. The firm did not discontinue business until January, 1921. The

finding is explicit that "some collections from premiums were made in January and February, 1921" and "Huff was unable to determine the amount of Huff & Mabry's assets before the close of 1920." In February; 1921, the firm assets were found to amount to $3,228.65 and this sum was paid to the association, with the amount paid by Huff as above stated. Upon these facts we find no basis for the conclusion that Huff sustained a deductible loss in 1920.

*Second.* The respondents make an alternative claim upon the ground that the amount due Huff by his firm was a debt "ascertained to be worthless" and hence deductible under § 214 (a) (7) of the Revenue Act of 1921. This claim was not passed upon by the Circuit Court of Appeals, but it was considered and rejected, properly as we think, by the Board of Tax Appeals. The facts as found show that the results of the firm's business were not known prior to 1921 and that no portion of the debt was ascertained to be worthless within the preceding taxable year.

*Judgment reversed.*