**BOSTON CONSOL. GAS CO. v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 3733.**

Circuit Court of Appeals, First Circuit.

May 29, 1942.

John E. McClure, of Washington, D. C. (Maude Ellen White and Miller & Chevalier, all of Washington, D. C., and J. Rex Dibble and Miller, Chevalier, Peeler & Wilson, all of Los Angeles, Cal., on the brief), for petitioner for review.

Samuel O. Clark, Jr., Asst. Atty. Gen. (Samuel H. Levy, J. Louis Monarch, Gerald L. Wallace, and Joseph M. Jones, Sp. Assts. to Atty. Gen., on the brief), for Commissioner.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This is a petition by the Boston Consolidated Gas Company for review of a decision of the Board of Tax Appeals (44 B.T. A. 793) determining an income tax deficiency against it in the amount of $32,170.98 for the calendar year 1935.

The petitioner was incorporated in Massachusetts in 1903 for the purpose of acquiring the assets and assuming certain of the liabilities of eight pre-existing gas companies. Since 1905 its business has been principally that of manufacturing, producing and selling gas for light, heat and power. It supplies the City of Boston and suburban territories.

In the regular course of its business the petitioner bills its customers monthly for gas consumed, but, to insure that gas bills will be paid, the petitioner, as its predecessors did before it, requires a cash deposit from certain of its customers at the time their meters are installed. By the terms of a deposit agreement signed at the time, the petitioner agrees that the net amount of the deposit remaining after the payment of all charges will be returned to the customer upon the termination of the contract to supply him with gas and the discontinuance of service to him. From prior to 1905 to the taxable year 1935, such of these deposits as had fallen due, but were unclaimed, had been accumulated by the petitioner and its

predecessors all of which were accounted for in a general ledger account which, on December 31, 1935, showed a credit balance of $431,014.44.

On December 31, 1935, the petitioner, to support its general ledger, set up a detailed customers' ledger which showed a credit balance of $328,143.28. To bring the general ledger into balance with the detailed customers' ledger the petitioner on the above date credited the difference between them—$102,871.16—to its profit and loss (surplus) account. The Commissioner determined that this difference of $102,871.16 as "unclaimed amount of deposits made in the distant past by inactive customers, credited to surplus in 1935" constituted taxable income during that year, and his determination was sustained by the Board of Tax Appeals.

This is the first issue. The second is closely related to it.

In the regular course of its business the petitioner uses in certain districts, as it always has done and as its predecessors did before it, a method of collecting in advance for gas supplied by the use of a device referred to as a quarter meter, that is, a machine which automatically delivers a measured quantity of gas when a twenty-five cent piece is deposited in it. The use of these meters results in an initial overpayment for gas by the customer, so, to make the rates charged to all customers the same, quarter meters are read monthly and those who use them are credited on the petitioner's books with the amount of their excess payments. It often happens that customers using this type of service move away, in which event the petitioner makes an effort to locate them in order to refund the amount due, but, this failing, the petitioner carries the amount on its books as a liability and stands ready to make a refund to such customers upon the presentation of a valid claim. The same accounting methods were used with respect to these unpaid refunds as were used with respect to unclaimed deposit balances and, on December 31, 1935, when the detailed customers' ledger was set up, it was brought into balance with the general ledger with respect to unclaimed refunds by a credit to the profit and loss (surplus) account of $53,-453.55. This sum also was determined by the Commissioner to be income received by the petitioner in 1935, and his determination was sustained by the Board of Tax Appeals.

The third issue involves an embezzlement. The petitioner's treasurer and head cashier died on January 30, 1935, having last worked on January 21, of that year. An audit of the petitioner's books made during 1935 by certified public accountants showed that he had embezzled $99,139.09, $98,323.55 of which had been embezzled before December 31, 1934. No shortage through embezzlement was brought to light by the annual audit of the petitioner's books made early in 1934 for the calendar year 1933. On account of this shortage the petitioner in 1935 recovered from a bonding company $25,000; from the treasurer's beneficiaries $10,000; and from cash found hidden in a safe $2,599.15; making a total recovery of $37,599.15. The balance of the shortage—$61,539.94—it charged off on its books in 1935 and claimed as a deduction in its 1935 income tax return. The Commissioner, by computations which need not be described, in determining the petitioner's deficiency allowed as a deduction only $506.-24 on the ground that this was the net amount embezzled in 1935. The Board of Tax Appeals sustained the Commissioner and entered its decision accordingly.

The first two issues can conveniently be considered together.

The petitioner makes the point that: "The mere act of balancing the books in the current year in order to bring them into balance with respect to prior year items, resulting in a credit to surplus, is not in itself a basis for saying that the book credit is realized income." It contends that in crediting the amounts in question to surplus it was merely simplifying its method of bookkeeping, not appropriating the sums involved as its own property, which, indeed, it could not do because both the unclaimed refunds and unclaimed deposits were debts which it owed, and the one who owes a debt is not the one who has the power to forgive it. The Commissioner, on the other hand, takes the position that the petitioner, in adjusting its general ledger to conform with its newly set up detailed customers' ledger, eliminated "the necessity for continuing to hold in reserve deposits or overpayments made by such former customers." So that "When the company thus transferred a portion of the reserve to profit and loss (surplus), it made that amount fully available for its general use. The items could then, for the first time, be classified as income of the company." The Board of Tax Appeals

affirmed the Commissioner's determination of deficiency on the authority of Chicago R. I. & P. Ry. Co. v. Commissioner, 7 Cir., 47 F.2d 990, and Charleston & W. C. R. Co. v. Burnet, 60 App.D.C. 192, 50 F.2d 342, adding: "It is true that subsequent to 1935 petitioner paid out the sum of $3,108.93 against the amount of $102,871.16 and there is a possibility more claims may be presented and paid. If so, such payments should be deducted from income in the year in which paid. Obviously they do not affect the status of the $102,871.16 and $53,-453.55 which petitioner transferred to profit and loss (surplus) in 1935 and made available for general uses including the payment of dividends." [44 B.T.A. 797.]

We affirm the decision of the Board on these two issues.

 If we cannot take judicial notice of the fact that refunds and deposits once unclaimed are more than likely to remain unclaimed forever, it is clearly evident from the sums involved that such is in fact the case. The net accumulation of unclaimed deposits over a thirty year period amounted to $102,871.16 and the net accumulation over the same period of unclaimed refunds amounted to $53,453.55. Between December 31, 1935, and December 31, 1939, it appears that the petitioner on demand returned deposits to former customers, or credited to them in the detailed customers' ledger which it established in 1935, an aggregate net amount of $3,108.93. It does not appear how much, if anything, was during the same four year period refunded to departed customers who had been on the quarter meter service. From the foregoing it seems clear that although unclaimed deposits and unclaimed refunds were originally liabilities, and although theoretically they may remain such, still, as a practical matter, they became income by the passage of time. It seems to us, therefore, looking at the question from a practical point of view as we are admonished to do, (Farmers' Loan & Trust Co. v. Minnesota, 280 U.S. 204, 212, 50 S.Ct. 98, 74 L.Ed. 371, 65 A.L. R. 1000; Tyler v. United States, 281 U.S. 497, 503, 50 S.Ct. 356, 74 L.Ed. 991, 69 A.L. R. 758), that the petitioner in setting up its books on December 31, 1935, must have taken the practical view and elected at that time to treat as income both unclaimed deposits and unclaimed overpayments by users of quarter meters.

The cases relied upon by the Board involve unclaimed overcharges resulting from errors in computing passenger fares, checks and vouchers never presented for payment, and unclaimed wages due to former employees who had left the taxpayer's service. In each case the taxpayer had credited the sums involved to "profit and loss" during the taxable years in question and the court held that the items constituted taxable income for the year in which the credit was made. Although the cases are not squarely in point they are analogous and support the result which we reach. They squarely support the conclusion of the Board quoted above to the effect that deposits returned and overpayments refunded under such circumstances may be deducted from income in the year in which such return or refund is made, and with this conclusion we agree.

We do not agree with the decision of the Board on the issue of embezzlement however.

The applicable statute, Revenue Act of 1934, § 23, 48 Stat. 680, 688, 26 U.S.C.A. Int.Rev.Code § 23(f), provides: "In computing net income there shall be allowed as deductions: * * * (f) In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise." Clearly the petitioner sustained a loss because of the embezzlement of its treasurer and head cashier, and there is no dispute but that the amount of this loss, not compensated for by insurance or otherwise, was $61,539.94. The only question is whether the petitioner can deduct the entire net amount of its loss in its tax return for 1935, the year in which the loss was discovered and its net amount determined, or whether it can deduct in that return only the small fraction of its loss, as adjusted by the Commissioner, which it incurred during the calendar year 1935, the balance not being deductible in any year because of the petitioner's inability to prove the actual date of each separate act of embezzlement.

The Commissioner argues that under § 23 subsection (f) a loss must be deducted in the year in which it is sustained even though it is not discovered until a later year and that "Since the statutory language is unambiguous, there is no room for judicial interpretation."

So far as we can determine the Supreme Court of the United States has not spoken on this question except to say by way of dictum in Burnet v. Huff, 288 U.S. 156, 159, 53 S.Ct. 330, 331, 77 L.Ed. 670, that: "The

Government concedes that if assets of the taxpayer used in trade or business, or 'in any transaction entered into for profit,' are stolen in any year, the taxpayer sustains the loss in that year and the deduction must then be taken even though the theft is not discovered or the amount ascertained until the following year." More direct authority for the Commissioner's view, however, is found in First National Bank of Sharon, Pa. v. Heiner, 3 Cir., 66 F.2d 925, and Borden v. Commissioner, 2 Cir., 101 F.2d 44.

In the First National Bank of Sharon case the United States Circuit Court of Appeals for the Third Circuit held that a loss sustained by the taxpayer through embezzlement prior to 1928, but not discovered until that year, could not be deducted as a 1928 loss, and the United States Circuit Court of Appeals for the Second Circuit ruled similarly in the Borden case, although in that case the loss was discovered before the date for filing the return for the year when the theft occurred.

On the other hand the Circuit Court of Appeals for the Sixth Circuit in Glenn v. Louisville Trust Co., 124 F.2d 418, 420, held that a loss sustained by a taxpayer through the unauthorized and improvident investment of his money by an agent or trustee could be taken in 1933, the year when the loss was adjusted and settled, even though the defalcation resulted in loss in 1930 and was discovered in 1931. In this case the court concluded its opinion with the statement: "Viewing the problem realistically, as we are enjoined to do by authorities so numerous that citation becomes superfluous, we conclude that upon whatever theory Pirtle or his estate suffered a loss through the unauthorized investment of his funds, the loss was suffered in 1933 when the extent of it first was ascertained."

■ While this case is not squarely in point, it seems to us to indicate the proper point of view from which to look at the problem presented by this phase of the case at bar. From the statute it is evident that Congress intended to permit taxpayers to deduct the net amount of their legitimate losses, but, for obvious reasons, Congress did not intend to permit a taxpayer to take a deduction for a loss in any year which might serve his interest. So, to accomplish its purpose, Congress naturally provided that losses should be taken in the year in which sustained. But, looking at the scheme devised for the taxation of incomes as a whole, and construing and applying the statute "with a view of avoiding, so far as possible, unjust and oppressive consequences", (Farmers' Loan & Trust Co. v. Minnesota, 280 U.S. 204, 212, 50 S. Ct. 98, 100, 74 L.Ed. 371, 65 A.L.R. 1000)[1] we believe that Congress did not intend that its rule should be inelastically and rigidly applied, and this we think the Treasury Department recognized when it used the word "ordinarily" in the last sentence of Article 43—2 of its Regulations 86.[2]

■ Doubtless in the majority of cases of the sort under consideration the end contemplated could be accomplished by filing in the year of discovery an amended return for the year of loss. But when as here no such amended returns could be filed by the petitioner because it was unable to determine the actual dates of the different acts of embezzlement, the results of which together caused its gross loss of nearly one hundred thousand dollars, we believe that the situation is so extraordinary that its total net loss may be deducted in the year when the loss was discovered and its extent determined, that is, 1935.

The case is remanded to the Board of Tax Appeals for a recomputation of the petitioner's deficiency in income tax for the year 1935 in conformity with this opinion.

MAGRUDER, Circuit Judge (concurring).

Analytically, it seems to me, the taxpayer did not sustain a loss at the time of the embezzlement from its cash account. The money in the embezzler's hands still belonged to the taxpayer. If the embezzler later used the money to acquire other property, the taxpayer could follow the res and enforce a constructive trust upon the property so acquired; or the taxpayer at its option could enforce an equitable lien upon such property to secure its claim for reimbursement from the embezzler. American Law Institute Restatement of Restitution,

---

[1] See also Lucas v. American Code Co., 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538, 67 A.L.R. 1010, in which it is said: "The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test."

[2] "A loss from theft or embezzlement occurring in one year and discovered in another is ordinarily deductible for the year in which sustained."

§ 202. At most there had been only a change in the form of the taxpayer's assets. In 1935, when the embezzlement was discovered, the taxpayer recovered in specie a small amount of the cash, $2,599.15. According to the stipulation, it recovered "from beneficiaries $10,000." This may mean, from the estate of the deceased embezzler, or it may mean from donees who received from the embezzler that amount of the stolen money; it does not matter which. The taxpayer was also reimbursed by a bonding company to the extent of $25,000. That left a balance of $61,539.94, which constituted a claim against the embezzler's estate. Evidently this claim was ascertained to be worthless, because it was charged off on the taxpayer's books in 1935. I agree with the court's conclusion that this sum of $61,539.94 was properly claimed by the taxpayer as a deduction on its 1935 tax return.

In the recent case of McKnight v. Commissioner, 127 F.2d 572, decided by the Circuit Court of Appeals for the Fifth Circuit, April 29, 1942, it was held that the embezzler of money, who is unable to restore it, does not make a taxable gain thereby. The court said: "By the taking the embezzler incurs an equivalent debt as surely as if he had borrowed with the consent of the owner. The first takings are, indeed, nearly always with the intention of repaying, a sort of unauthorized borrowing. It must be conceded that no gain is realized by borrowing, because of the offsetting obligation. This would be true even though at the time there was no intention to repay. It seems to us that the same thing is true of each act of embezzlement." If at the time of the embezzlement the wrongdoer makes no gain, because of the offsetting obligation, it seems logical to hold that the person whose money is taken does not at that time sustain a loss. Cf. Douglas County Light & Water Co. v. Commissioner, 9 Cir., 1930, 43 F.2d 904. Logic here coincides with practical convenience, because, as pointed out by Judge Woodbury, if the Government's view is accepted, the wronged party will often be deprived unjustly of a tax deduction through inability to prove the specific amounts embezzled in any particular year. The same injustice would also result if the taxpayer did not discover an embezzlement until too late to file an amended return and to claim a refund for the year in which the money was taken.