Arthur F. ARNOLD and Beckie Arnold

v.

UNITED STATES of America.

Civ. A. No. 2622.

United States District Court
N. D. Texas,
Amarillo Division.

Dec. 30, 1959.

Arthur Glover, Amarillo, Tex., for plaintiffs.

Chas. K. Rice, Asst. Atty. Gen., W. B. West III, U. S. Atty., Fort Worth, Tex., for defendant.

DOOLEY, District Judge.

### Facts

The plaintiffs Arthur F. Arnold and Beckie Arnold are husband and wife. He

was born May 4, 1886. Under date of November 3, 1937, the said husband obtained an endowment policy and again under date of November 3, 1941, obtained another such policy, both in equivalent terms, from the Southwestern Life Insurance Company, including a life insurance part in which said wife was the named beneficiary, for the sum of $5,000.00, or the cash value of the policy, whichever might be greater, effective only for the interim between the dates of said policies and the maturity thereof, set to be November 3, 1951. In event said husband lived to the maturity date of said policies, he would then, in his sixty-fifth year of life, become the exclusive owner, entitled to all the benefits of the policies, except for the contingent possibility that the wife could come in as a beneficiary again, under provisions that the Company would either (1) pay $50.00 on each policy to the husband on said maturity date and a like amount monthly thereafter so long as the husband continued to live, with the proviso that if he should die before having received such payments for one hundred and twenty (120) months, the payments for the remainder of such ten year period would be made as they respectively became due to his wife, or else (2) the husband at such maturity date could elect to receive payment of the cash value of the policies in lieu of the monthly income payments aforesaid.

The husband, at the maturity date of said policies, elected to accept from the Company two life income agreements, in identical terms, bearing even date with the maturity of the pre-existing policies, in satisfaction of the Company's obligations under such policies and, conforming with the terms of the policies, each of said agreements provided for monthly payments of $50.00 for the guaranteed period of one hundred and twenty months, and thereafter so long as the husband might live. The most crucial provision in said contracts is from his written election and quoted, as follows:

"I reserve to myself the right on any anniversary date of the agreement issued pursuant to this request to withdraw the commuted value of the unpaid payments for the remainder of the guaranteed period calculated on the basis of interest at the guaranteed rate hereinbefore specified, and in the event I make such withdrawal, then the monthly payments herein provided for shall cease for such remaining portion of the guaranteed period, but shall be resumed on the third day of November 1961 if I am then living, and continue so long thereafter as I shall live."

The said husband thereafter and pursuant to the reserved commutation option quoted above, but after having received the stipulated monthly payments for three years elected, effective November 3, 1954, to receive a lump commuted payment in lieu of the specified monthly payments for the remaining seven (7) years of the aforesaid guaranteed period of ten years or 120 months. The Company then paid him the amount of $7,440.56, as the aggregate commuted value payable for the remainder of said guaranteed payments upon the two contracts aforesaid.

The husband paid total premiums of $13,598.15 to the Company on the two endowment policies which matured on November 3, 1951, and at said maturity date the policies had a total cash value of $13,740.00, which was liquidated in exchange for the two life income agreements. In their 1954 Income Tax Return the plaintiffs husband and wife claimed a deduction for an alleged loss precipitated by the husband's commutation choice aforesaid in the transaction which began with the purchase of the two endowment policies and was then folded into the two life income agreements, and undertook to sustain the contention under the terms of the Internal Revenue Code of 1954, Title 26, § 165(a), (c) (2), reading, as follows:

"(a) General rule—There shall be allowed as a deduction any loss sustained during the taxable year and

not compensated for by insurance or otherwise. * * *

"(c) Limitation on losses of individuals—In the case of an individual, the deduction under subsection (a) shall be limited to—* * *

"(2) Losses incurred in any transaction, entered into for profit, though not connected with a trade or business."

In calculating the alleged loss, the plaintiffs in their return took as the initial cost of the two agreements an amount equal to the total premiums paid on the two endowment policies, that is $13,598.15, and then adjusted that amount downward, by reason of certain factors it is not necessary to here detail, until the remaining so-called investment value becomes $9,952.50, from which is deducted the commutation payment of $7,456.26 (which apparently should have been $7,440.56) leaving the alleged loss of $2,496.24. The plaintiffs by amended pleading have raised their claim to $3,-588.24. In computing said asserted loss, the plaintiffs take no consequential notice of the fact that the Company is still obligated to the plaintiff husband to resume monthly payments of $100.00 under the two agreements together on November 3, 1961, if he is then alive, and continue same so long thereafter as he shall live. In event he does live until November 3, 1961, he will at that time have a remaining life expectancy of 6.2 years. The Commissioner has rejected the loss claimed and determined a deficiency in income tax against the plaintiffs for said year in the sum of $1,050.60 plus interest of $160.09 or a total of $1,210.69. The plaintiffs paid said deficiency and their claim for refund having been disallowed, this suit was filed.

## Legal Questions

The two controlling legal questions are (1) whether the transaction in question was entered into by the plaintiff husband for profit, and if so (2) whether or not the husband, or both he and his wife, have actually sustained any loss as claimed. These points will be discussed in that order.

## Opinion

 The action of the Commissioner was presumably proper under the law and the burden of proof is on the plaintiffs to overcome the prima facie propriety of disallowing the loss claimed. It is, at least, doubtful that the husband was actuated by any primary purpose of profit when he obtained the two endowment policies. In the first place, there was very little prospect of profit in the ordinary sense of that term and any potential profit was very little in amount. This is illustrated by the fact that when the endowment policies matured the cash value of same exceeded the aggregate premiums paid by only $141.85. That would have been trivial incentive to a profit-seeker. Furthermore, when the husband elected to take the commutation value of $7,440.56, that amount plus the $3,600.00 he collected in monthly payments during the first three years of the guaranteed period of ten years was the full and final receipts he could muster up to that point against the total premium outlay of $13,598.15, thus leaving a deficit of $2,557.59. Of course, he also had the earning value of the commutation in money, but there is no proof of what use he made with it in this record and, besides, what he may have made out of it by his own efforts would not have been any profits on his insurance investment from the Company. This state of things was not fortuitous at all. It was predetermined just how much premium cost the husband would have in the transaction if the endowment policies ran to their maturity date and what the cash value thereof would be at that time. Likewise, the commutation value of the guaranteed period of ten years under the life income contracts could have been ascertained, so far as this record indicates, at the inception of the transaction. In other words, all of what has happened could have been predetermined. The plaintiff husband to the present time has received everything he bargained for in this transaction and it would strain good

reason to say that a shrinkage incidental to the agreed operation of a lawful contract could be translated into a loss deductible under the income tax law. In contrast, as it turns out, had the husband kept the payments due him on the monthly payment basis, as specified, instead of electing to take a commutation payment, sixty monthly payments of $100.00 each, or $6,000.00, would have been collected now in addition to the $3,600.00 monthly payments which were collected, making the full amount $9,600.00, with twenty-four months still left of the guaranteed period of ten years. It follows that, if the husband lives said twenty-four months and should be paid the monthly installments meanwhile, his returns would then better that realized by his commutation decision. It is not too much to say that the husband in the exercise of his best judgment between alternatives in a fair sense invited what is now an alleged loss, even though that consequence may have been offset in his mind by what he regarded as some compensating advantage. The most plausible explanation is that the plaintiff husband, who was fifty-one years old at the time he obtained the first one and fifty-five years old at the time he obtained the second endowment policy, more than likely was then primarily interested in having some insurance benefits for his wife, if he should die during the term of such policies, and then at the maturity of the endowment policies, when he had become sixty-five years old, he was primarily interested in a definite and reliable security of some income certain during his later years. The finding is made that he did not enter into the transaction in question primarily with a profit object.

The impediment to demonstrating the loss claimed by the plaintiffs husband and wife is that the contractual rights and obligations, which resulted from the transactions between the plaintiff husband and the Company, have not been impaired by any breach of contract, any insolvency of the Company, any marked decline or anything else that would entail a shrinkage in values. The husband has gotten precisely what he bargained for in his deals with the Company. One of the options inuring to the husband at the maturity of the endowment policies was the election to choose a settlement consisting of the life income agreements accepted by the husband, securing a dependable income at the rate of $100.00 per month, with a guaranteed minimum of one hundred and twenty months and to continue thereafter, if he is then alive, for the rest of his lifetime. These settlement agreements included another option that would enable the husband to commute the remaining guaranteed payments at any anniversary date during the said period of one hundred and twenty months, or ten years, but naturally any such prepayment would have to be on a discount or present value basis. He did decide to commute such payments for the last eighty-four months of the guaranteed term and that voluntary choice is the crux of the loss claimed. The plaintiffs are thus in the untenable position of putting the guise of a loss on the consequences of the husband's voluntary choice of alternatives under his contracts with the Company. The so-called loss in reality is simply a consensual equation in value between a present payment lump sum and a greater total sum paid in equal monthly installments during seven years. There is no evidence whatever that the contracts had become any less in value at the commutation date in November 1954 than same were at the issuance date in November 1951. The commutation discount was simply an incident of that particular choice prearranged from the very creation of the endowment policies.

There is still another viewpoint which negatives any loss within the intent of the income tax laws. The transactions initiated by the endowment policies cannot be given segmented treatment to discover a loss which would be deductible for the purposes of income taxes. On the contrary, a given transaction must be followed through to the final work out, so long as there is any reasonable prospect of an outcome which might

alter the attitude of any intermediate prima facie loss. The plaintiffs in this instance, however, seek to deduce a loss within the bounds exclusively of the commutation decision made by the plaintiff husband and do not take proper notice of the insurance value in the life insurance provision in favor of the plaintiff wife for fourteen years at the outset, nor of the fact that the plaintiff husband, if he lives so long, will begin receiving monthly payments of $100.00 from the Company again on November 3, 1961, when his remaining life expectancy will be 6.2 years and continue to receive such payments for the rest of his life. If he lives out his life expectancy, such renewed payments will aggregate about $7,500.00. In that eventuality, he will have received all told $3,600.00 for the first three years of the guaranteed one hundred and twenty months period under the life income agreements, plus $7,440.56 in the commutation payment for the last seven years of the one hundred and twenty months guaranteed period, plus about $7,500.00 for the 6.2 years of renewed payments under said contracts, making a total of around $18,540.56 paid as against the aggregate premiums in the sum of $13,598.15. Obviously, no loss would be harbored in that final outcome. If he lives longer, of course, the spread would be increased.

The plaintiffs husband and wife contend that the prospect for the plaintiff husband to receive monthly payments from the Company during the 6.2 final years of his life expectancy is a thing contingent and uncertain and there is no saleable value for such a mere possibility of income. Of course, there would be no market for such problematical expectancies, but just as surely that does not say that it is worthless to the plaintiff husband. His chances, according to the best human calculations, are just as good in favor as against his ultimate collection of such renewed payments under his contracts and it would be an illogical contradiction to say that same are utterly worthless. It is true that such contingent payments do not have any cash value in the insurance sense, but the assistant actuary of the Company, by his letter in evidence as Exhibit 14, has stated, as follows:

"The agreements do not have a surrender value. However, the contracts do have an actuarial value in that the Company has an obligation to resume the monthly payments to Mr. Arnold if living on November 3, 1961.

"This actuarial value of each contract according to the reserve basis used by the Company amounted to $2,164.94 on November 3, 1954."

Furthermore, the assistant actuary, by his letter in evidence as Exhibit 19, made another statement, as follows:

"The maturity value of the two original policies in 1951 was $13,740.00, and was allocated as follows:

| | |
|---|---|
| "(1) To the guaranteed payments for ten years | $10,150.00 |
| "(2) To the balance of the payments | 3,500.00 |
| | $13,740.00" |

This leads to the ruling that the plaintiffs have not sustained any loss in law, the very nature of the pertinent business excluding the existence of any loss, or, at least, there is no presently ascertainable loss. Judgment will be rendered for the defendant.

### Authorities

The case which seems to be decisive in principle against the present taxpayers dealt with a contract of 1927 between the owner of certain realty and office building and Irving Trust Company for a lease on the main floor premises from the owner to the Company at the annual rental of $25,000.00 and for a term of 15 years, beginning in 1932.

"In 1933, the Irving Trust Co. found it unprofitable to maintain a branch in petitioner's building. After some negotiations, petitioner and the Trust Co. agreed to cancel the lease in consideration of a pay-

ment to petitioner of $140,000. Petitioner did not include this amount in gross income in his income tax return for 1933. On the contrary, he reported a loss of $21,494.75 on the theory that the amount he received as consideration for the cancellation was $21,494.75 less than the difference between the present value of the unmatured rental payments and the fair rental value of the main floor and basement for the unexpired term of the lease. He did not deduct this figure, however, because he reported other losses in excess of gross income. * * *

"We conclude that petitioner must report as gross income the entire amount received for cancellation of the lease without regard to the claimed disparity between that amount and the difference between the present value of the unmatured rental payments and the fair rental value of the property for the unexpired period of the lease. The cancellation of the lease involved nothing more than relinquishment of the right to future rental payments in return for a present substitute payment and possession of the leased premises. Undoubtedly it diminished the amount of gross income petitioner expected to realize, but to that extent he was relieved of the duty to pay income tax. Nothing in § 23(e) indicates that Congress intended to allow petitioner to reduce ordinary income actually received and reported by the amount of income he failed to realize." Hort v. Commissioner of Internal Revenue, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168.

"That the agreement itself imports a consideration, deemed by the law valuable, there can be no doubt. An agreement to give a less sum for a greater, if the time of payment be anticipated, is binding; the reason being, as expressed in Pennel's case, 5 Co.R. 117, that peradventure parcel of the sum, before the day, would be more beneficial than the whole sum on the day. (Coke's Lit., 212, b: Com.Dig., Accord, B, 2; Brooks v. White, 2 Met. 283)." Very v. Levy, 13 How. 345, 54 U.S. 345, 360, 14 L.Ed. 173.

"Similarly, the deductibility of losses under section 23(e), 26 U.S.C.A. § 23 note, may depend upon whether the taxpayer's motive in entering into the transaction was primarily profit." Helvering v. National Grocery Co., 304 U.S. 282, 289, footnote 5, 58 S.Ct. 932, 936, 82 L.Ed. 1346.

"The loss 'must be actual and present.'" Burnet v. Huff, 288 U.S. 156, 161, 53 S.Ct. 330, 332, 77 L.Ed. 670.

"The decisions, in which the [question of] gain or loss involved in annuity contracts is considered, for the most part take the view that when the clear purpose is manifest to safeguard the interest of the assured by providing a fixed annual income, the mere fact that the amount received is less than the premiums paid does not of itself constitute a deductible loss. Nor does the mere possibility that a profit may be incidentally involved indicate that the transaction was 'entered into for profit.'" Early v. Atkinson, 4 Cir., 175 F.2d 118, 123.

"The Tax Court was clearly correct in holding that the transaction between the petitioner and its customer in 1946 did not involve a deductible business loss. Before there is a valid deduction under Section 23(f) there must be a definite and ascertainable loss. * * * The petitioner here did not incur an as-

certainable loss in 1946. It merely executed a contract with its customer on which it might have suffered a loss. But as a matter of fact, no loss was ever actually incurred." Loewi & Co. v. Commissioner of Internal Revenue, 7 Cir., 232 F.2d 621, 625–626.

"It has been held that the actuarial or theoretical value of an annuity, when issued, cannot be used as the basis for determining a loss claimed by reason of the annuitant's death before the fulfillment of the expectancy upon which the annuity was computed. * * * Whether an annuitant lives a longer or shorter time than his expectancy is immaterial to the question of the value of the annuity. Elements of value other than the right to receive payments for life are present in an annuity, e. g., security, assurance of income, regularity of payments and relief from responsibility of attending to investment. The experience which actually develops for the annuitant, whatever that may be, extinguishes both the annuity's cost and its expected returns as a capital investment." Evans v. Rothensies, 3 Cir., 114 F.2d 958, 961–962.

"The taxpayer accepted the contract upon the basis of its terms which assured her of the payment of the annuity for the actual period of her mother's life and not for the period of her supposed expectancy of life. Had the contract stipulated for a payment of $5,000 a year for 15 years, 1 month and 9 days, a default of payment for the last 3 years, 1 month and 9 days of that period would have caused a loss computable upon a different basis than now obtains in this case. But the contract as executed was not for the payment of the annuity for a fixed term of years, but only for the period of her mother's life. Consequently, the calculated difference between the expected value of the annuity contract as of the time when executed and its actual value as afterwards determined, does not furnish a basis for the taxpayer's claim of a deductible loss." Helvering v. Louis, 64 App. D.C. 263, 77 F.2d 386, 387–388, 99 A.L.R. 620.

"In Dresser v. United States, 55 F.2d 499, 510, 74 Ct.Cl. 55, the court said: 'A loss, in order to be deductible under the statute, must be an unintentional parting with something of value.' * * *

"In the instant case the taxpayers purposely expended their money to purchase the annuities. This was not a case of 'unintentional parting' with money. The brothers were under no obligation to provide for their sister as they did. * * * Moreover, the brothers merely agreed that Lauretta would receive for her life all dividends which might be declared and paid on the preferred stock. If no dividends were declared on the preferred stock while the brothers held it, they would have been under no legal obligation to provide for their sister.

"Be that as it may, the brothers sold the preferred stock, and thereupon they became legally bound to provide for their sister. They made immediate and satisfactory provision for her with the payment of cash and the purchase of annuities. Whether this direct outlay of cash by the brothers was an investment or gamble for profit on the longevity of Lauretta's life is denied by the nature of the transaction itself. The brothers provided for their sister generously and permanently out of respect to their mother's wishes or love for their sister or both. Their conduct was in every way commendable. The fact that conceiv-

ably the brothers might enjoy a profit if the sister lives beyond her age expectancy appears as an extremely remote consideration, and the significance of the conceded profit from the sale of the common stock likewise pales before the crux of the 'transaction,' which, from all the circumstances appearing herein, was to provide for the sister. Looking at the 'substance of the transaction,' that the agreements were the products of a cohesive and financially-independent family unit; that the sister was by far the least provided for; that the testatrix's chief purpose in entering the agreements and writing her will was to provide for Lauretta's financial welfare; that the brothers almost immediately upon the sale of the stock made satisfactory substitution to their sister for any dividend payments she might lose, we are driven to the conclusion that the brothers did not enter into this transaction for profit." Seaman v. United States, 7 Cir., 156 F.2d 719, 725–726.

"On the other hand a capital loss can not be claimed while there remains a reasonable possibility of recoupment. Loss, to be deductible, must in general be evidenced by completed transactions, fixed by identifiable events. The loss must, within reason, be final and irrevocable. * * * Applying the rule to this case, it appears to us that there was in 1933 a fair probability that the taxpayer would recoup a substantial portion of its loss. Substantial recoveries were in fact made on all three of the items specified in the contract with First Bank; and looking at the situation as of April 1933, it was not at all unreasonable to expect that there would be recoveries. One need not then have been a confirmed optimist to anticipate an improvement in banking and general business conditions, accom-

panied by a rise in the value of securities and other forms of property. Under the circumstances, the loss was not claimable until the amount finally payable under the contract had been ascertained." First National Corporation of Portland v. Commissioner of Internal Revenue, 9 Cir., 147 F.2d 462, 464. See also Burdan v. Commissioner of Internal Revenue, 3 Cir., 106 F.2d 207.

"A life insurance policy ordinarily combines investment with insurance protection. The decision in Lovell v. St. Louis Mutual Life Ins. Co., 111 U.S. 264, 274, 4 S.Ct. 390, 395, 28 L.Ed. 423, where the contract was terminated by the act of the company and the policyholder demanded a return of all premiums paid, with interest, less the amount of his premium note, illustrates this double feature. The court there said: 'But we do not think that he is entitled to a return of the full amount of his premiums paid. He had the benefit of insurance upon his life for five years, and the value of that insurance should be deducted from the aggregate amount of his payments. In other words, the amount to which the complainant is entitled is what is called and known in the life insurance business as the value of his policy at the time it was surrendered, with interest, less the amount of his premium note, which should be surrendered and canceled.'

"In the earlier years of a policy, the annual life premium is in excess of the amount required to pay the current cost of insurance protection and such excess is retained by the insurance company as a reserve and increased at compound interest at an agreed rate for the purpose of making good the deficiency in later years when the annual premium is no longer sufficient to pay for the actual cost of insurance..

The fund accumulated out of the excess premiums is known as the 're-serve' on the policy and represents the investment portion of the premium payments held for the benefit of the policyholder. In case the policy is surrendered or allowed to lapse, the holder may receive the reserve held for his benefit known as the 'cash surrender value,' which represents the equity of the insured in the policy above the amounts paid for protection. * * * It may be assumed, in the absence of any proof to the contrary, that the cash surrender corresponds with the amount of the reserve; that is to say, with the excess of premiums over what was required for protection. * * *

"We can see no escape from the conclusion reached by the Board that no loss was established in this case, for the reason that the cost was approximately reflected in the cash surrender value. The portion of the premiums not used to build up the reserve was paid to obtain the insurance protection which was for many years afforded." London Shoe Co., Inc. v. Commissioner of Internal Revenue, 2 Cir., 80 F.2d 230, 231, 233.

---

The Cohan case in the Board of Tax Appeals, cited by the plaintiffs, is readily distinguishable from this litigation since there it was plain and certain beyond any question that the annuity contract in question was obtained with the specific objective of profit, and that purpose was so dominant that when he found out it was a bad bargain profit-wise, he tried to surrender the contract and have the first premium refunded, and on failing to make this disposition, he let it lapse by default in payment of the next premium.